# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

|                                          |     |                          |
| ---------------------------------------- | --- | ------------------------ |
| IN RE                                    | )   | Case No. 12-02040-TLM    |
|                                          | )   |                          |
| **BARRY TODD BAILEY and**                | )   |                          |
| **ANNE MARGARET BAILEY,**                | )   | Chapter 7                |
|                                          | )   |                          |
| Debtors.                                 | )   |                          |
| _____             | )   |                          |
|                                          | )   |                          |
| **BRIAN D. BURKS, EMERALD**              | )   |                          |
| **ASSET MANAGEMENT nka**                 | )   |                          |
| **BURKS WEALTH**                         | )   |                          |
| **MANAGMENT, INC.,**                     | )   |                          |
|                                          | )   |                          |
| Plaintiffs,                              | )   |                          |
|                                          | )   |                          |
| v.                                       | )   | Adv. No. 12-06057-TLM    |
|                                          | )   |                          |
| **BARRY TODD BAILEY,**                   | )   |                          |
|                                          | )   |                          |
| Defendant.                               | )   |                          |
| _____             | )   |                          |

## MEMORANDUM OF DECISION

_____

Defendant Barry Todd Bailey filed his chapter 7 bankruptcy petition on

August 21, 2012.[1]  On October 23, 2012, plaintiffs Brian Burks and Emerald Asset

Management, Inc. ("EAM") filed this adversary proceeding, seeking to hold debts

_____

[1] Unless otherwise indicated, all chapter, section and other statutory references are
to the Bankruptcy Code, Title 11, U.S.C. §§ 101–1532 (the "Code"), and all rule
references are to the Federal Rules of Bankruptcy Procedure 1001–9037.

MEMORANDUM OF DECISION - 1

owed by Bailey to Plaintiffs nondischargeable under § 523(a)(2)(A) and (a)(6).[2]

The claims underlying this nondischargability action were partially litigated in

state court before bankruptcy.  The Court granted partial summary judgment for

Plaintiffs, based on a state court order and principles of issue preclusion,

establishing Bailey breached a covenant not to compete.  Doc. No. 21.  The

balance of the adversary proceeding came before the Court for trial on May

29–31, 2013.  This Decision constitutes the Court's findings and conclusions

pursuant to Rule 7052.

**FACTS[3]**

**A.      History of EAM**

          After working as an investment advisor representative ("IAR"), Burks

founded his own financial and investment planning firm, Burks Investments, in

2002.  Burks Investments functioned as a registered investment advisor ("RIA").[4]

---

[2] Because there are two plaintiffs, the Court will refer to "Burks" and "EAM" when discussing them individually, and "Plaintiffs" when discussing them collectively.  The Court will refer to the defendant as "Bailey."

[3] The Court makes these factual findings after considering the totality of the evidence.  It has considered carefully the testimony of the parties and witnesses, as well as the documentary evidence.  The Court has determined the credibility of each witness and the weight to be given their testimony, especially in light of contradictory evidence and testimony presented at trial.

[4] The terms "IAR" and "RIA" were used by the parties throughout the trial though only partially explained.  Both allow the licensed party to provide advice about investment in securities.  To qualify as an RIA, a firm must meet certain requirements, including having a qualifying officer with certain licenses.  To qualify as an IAR, a person must be employed by or otherwise associated with an RIA.

MEMORANDUM OF DECISION - 2

Burks Investments also was a licensed insurance agency selling life, health, long-term care and similar types of insurance.

Burks met Bailey through a mutual acquaintance.  At that time, Bailey operated a non-RIA financial planning firm, Emerald Financial Advisors, Inc., as well as his own law firm, Bailey Law Office.  Bailey also operated as an IAR under Hornor Townsend & Kent's RIA designation.

In December 2004, Bailey and Burks decided to form their own company.  Bailey became half-owner of Burks Investments, which continued operating as an RIA.  Burks Investments was then incorporated as EAM, and EAM began doing business as Emerald Financial Advisors.  *See, e.g.,* Exs. 105–110 (client contracts, each stating that the named client "hereby employs Emerald Asset Management, Inc. dba Emerald Financial Advisors . . . as a Registered Investment Advisor[.]").  Bailey acted as an IAR under EAM's RIA license.  Bailey continued his separate law practice.[5]  Confusingly, he also operated Emerald Financial Advisors, Inc. (as a non-RIA firm), which, like EAM, did business as Emerald Financial Advisors.

Burks testified that he became aware of problems involving Bailey in 2010, including discovery that EAM had been named as a co-defendant in a lawsuit

---

[5] Bailey continued practicing law until May 2013, when he voluntarily suspended his license until the Idaho State Bar concludes its investigation into disciplinary matters involving him.  Those disciplinary matters have been stayed pending conclusion of civil cases involving those same matters.  The Court takes notice of Bailey's suspension pursuant to Fed. R. Evid. 201.

brought against Bailey, although he did not testify to any details about this suit.

Early in the summer of 2010, Bailey requested Burks buy out his shares of EAM.

According to Burks, Bailey told Burks he was insolvent, and therefore could not

maintain his requisite licenses for the business.

Bailey originally asked for $270,000 for his shares, but the parties

ultimately negotiated a price of $110,000 based on the value of each of the

existing client accounts and the economic expectancy to EAM from those clients.

Burks' counsel and Bailey jointly drafted the provisions of a Stock Purchase and

Redemption Agreement, Ex. 100 ("Stock Purchase Agreement").

Central to the Stock Purchase Agreement was a three-year covenant not to

compete (the "Covenant"), for which EAM paid an additional $2,500.[6]  The

---

[6] The Stock Purchase Agreement makes clear that EAM, rather than Burks, purchased the Covenant.  Ex. 100 at 1.  The Covenant states:

> Covenant Not to Compete.  Bailey agrees that for a period of three (3) years from the Effective Date, Bailey shall not individually or collectively, whether as an officer, director, owner, employee, partner, shareholder, consultant, or other participant (1) solicit or attempt to solicit, induce or attempt to induce, directly or indirectly, any "Current Client" from the Corporation for any "Investment", "Insurance," or "Financial Planning Services." in, or (2) interfere with, disrupt, or attempt to disrupt contractually or otherwise, any relationship between the Corporation and any of its customers, carriers, clients, advisors, or employees (the "Covenant Not to Compete") or (3) provide Client names or information to any other individual or company for any purpose.  The term "Current Clients" means clients of the Corporation who have an account with the Corporation on the Effective Date.  The term "Investment Services" means the advising of others, for a fee or commission, as to the value of securities or the advisability of investing in, managing of, purchasing or selling securities or life insurance products, including annuities, and the providing of other advisory services that are an integral
>
> (continued...)

MEMORANDUM OF DECISION - 4

Covenant prohibited Bailey from soliciting EAM clients for investment advice, life insurance or other financial planning services, disrupting the relationship between EAM and its clients, or providing information about EAM clients to any third party for any purpose. The Covenant specifically allowed Bailey to continue providing legal services to parties who were EAM clients at the time of the stock purchase.

Burks testified that he would not have bought out Bailey without the reassurance of the Covenant because EAM's only assets were its clients.[7] Instead, he simply would have closed EAM, then started a new company and competed with Bailey for EAM's clients. Bailey acknowledged the importance of the Covenant, even telling Burks he would risk losing his law license if he violated the Covenant.

The sale closed on September 17, 2010. Bailey was paid with two cashier's checks, one for $85,000 for the stock purchase, Ex. 104, and one for $2,500 for

---

[6](...continued)
component of such services, including the charging of a fee for financial planning. The intent of this paragraph is to prevent Bailey from diverting investable assets, managed or not managed by the Corporation, of any Current Client away from the Corporation to other investments of any kind excluding only in-force life insurance policies which were in-force at the time of this agreement. Bailey may continue to provide legal services to one or more Current Clients of the Corporation.
Ex. No. 100 at 2.

[7] In addition, Burks also testified that an indemnification clause in the Stock Purchase Agreement was also extraordinarily important to the agreement, especially in light of the pending lawsuit against Bailey.

MEMORANDUM OF DECISION - 5

the covenant not to compete, Ex. 103. Burks and his wife also signed a

promissory note to Bailey, Ex. 101, for the remaining $25,000 balance of the stock

purchase price. The remaining $25,000 was due on September 15, 2011. Ex. 101

at 1. Burks has not made any payments to Bailey on the promissory note.

Burks terminated Bailey as an IAR in October 2010, after the stock

purchase closed.[8]

After the sale of Bailey's interest in EAM to Burks, relations between the

two men deteriorated. A dispute arose regarding how to split the data on EAM's

server to preserve each party's access to necessary information and files. And

confusion arose regarding mail forwarding due to the similarities in the

companies' names. These disputes are largely immaterial to the matters at issue in

this adversary proceeding, except to illustrate how caustic the relationship between

the two men became.

## B.   Bailey's interactions with Seehawer, Carlson and Concierge

For several years before entering the Stock Purchase Agreement, Bailey

knew Aaron Seehawer and Van Carlson, owners of Concierge Legacy Advisors,

Concierge Risk Alternatives and Concierge Private Wealth Management.[9]

---

[8] After Burks' purchase of Bailey's shares was completed, the company went through
multiple name changes before settling on Burks Wealth Management, the name it continues to
use today. For clarity and ease, the Court will refer to the firm throughout this decision as EAM.

[9] It appears that, although these entities maintained separate corporate structures, they
(continued...)

MEMORANDUM OF DECISION - 6

Concierge provides financial and investment planning and insurance products, and is an RIA.

In September 2010, even as he was negotiating the Stock Purchase Agreement—including the Covenant—with Burks and Burks' counsel, Bailey was also in the process of joining Concierge as an IAR. *See* Ex. 154 at 1 (email from Aaron Seehawer to Bailey discussing setting Bailey up as an IAR). Aaron Seehawer and Van Carlson both testified that during those talks, Bailey claimed he was going to bring over several of his clients from EAM.

On November 16, 2010, a Uniform Application for Securities Industry Registration or Transfer ("Form U4") was filed to add Bailey as an IAR under Concierge's RIA designation, so that he could be compensated for his investment work. Ex. 137. Aaron Seehawer testified that the Idaho Department of Finance informed him the Form U4 was unlikely to be approved and strongly suggested Concierge withdraw it. Concierge did so, filing a Form U5 to terminate Bailey's pending IAR registration on April 8, 2011. Ex. 138. As a result of not having an approved Form U4, Bailey was never paid by Concierge for any investment work.

## C.    EAM clients

Throughout its approximately six years in business, EAM formed

---

[9](...continued)
operated jointly. The Court finds that any distinctions between these entities are not material for the purpose of this decision, and will refer to them collectively as "Concierge."

MEMORANDUM OF DECISION - 7

relationships with a number of clients, many of whom were referred to Bailey by

his father, Darius Bailey.  By 2010, EAM managed accounts worth approximately

$20 million.  The company generally entered into a written investment

management agreement with each of its clients.  These contracts gave EAM the

discretion to manage the client's investment accounts, set forth the management

fee for those services, and allowed either party to terminate the agreement at any

time with a written cancellation notice.

Evidence presented at trial included investment management agreements

with Anne Graham King, Jackie Hutchison, Margaret Schuler, Schulerlane Farms,

Jack Huff, and Darius and Donna Bailey.  *See* Exs. 105–110.  Burks testified that

each were EAM clients on September 17, 2010, the date of the Stock Purchase

Agreement.[10]  Burks' testimony was corroborated by account statements that

covered the September 17 date for Anne Graham King, Jackie Hutchison,

Margaret Schuler, Schulerlane Farms, Jack Huff, and Darius and Donna Bailey.[11]

Exs. 111–115.

---

[10] Jack Huff passed away in June 2011, and his son, Robert Huff, has continued managing his investments on behalf of his estate.  Margaret Schuler passed away in June 2012.  For simplicity's sake, the Court will refer to Jack Huff and Margaret Schuler without distinguishing their respective estates.

[11] The investment management agreements referred to each of the named clients individually, while the account statements sometimes referred to trusts in those clients' names. Burks provided a garbled explanation for those inconsistencies, but the Court infers the inconsistencies result from sloppy record keeping.  The Court finds that the statements establish that these identified parties were clients of the firm at the time of the Stock Purchase Agreement regardless of whether they provided assets to EAM to manage as individuals or via trusts.

MEMORANDUM OF DECISION - 8

Additionally, Burks' testimony revealed Ken Hutchison, David McWilliams, Scott Gardner, Eugene Borman, Victor and Jeanne Yamamoto, Durk Irwin, Donald Lampe, Dahris Seggerman and Burks' parents were also EAM clients on September 17, 2010. Notably, Joseph and Susan Schuler were not personally EAM clients, despite the fact that Joseph Schuler oversaw the accounts for both Margaret Schuler and Schulerlane Farms.

After the Stock Purchase Agreement was completed, Bailey continued providing legal services to Anne Graham King, Margaret Schuler, Jack Huff and other EAM clients, as well as Joseph and Susan Schuler. Though he emphasized that he only contacted them to do legal work, Bailey had Anne Graham King, Joseph Schuler (on his own behalf, and on behalf of Margaret Schuler), Susan Schuler, and Jack Huff each sign a document—captioned as a "non-compete acknowledgment"—stating that he did not solicit them, provide their information to a third-party, or otherwise violate the Covenant. The last full sentence of each document stated, "I initiated the contact with Bailey for the purpose of changing investment advisors or strategies." Bailey testified that he drafted these documents and presented them to the respective clients to review and sign.

Anne Graham King's testimony calls into question the accuracy of the substance of these forms. In particular, she testified that she did not read the document before she signed it, and that she was merely following Bailey's

MEMORANDUM OF DECISION - 9

recommendation when she signed the form and ended her relationship with Burks, whom she liked.  However, Joseph Schuler testified that he read the document before he signed it, and verified that he sought to leave EAM.

In addition to attempting to become an IAR for Concierge, Bailey also introduced several EAM clients to Aaron Seehawer and Van Carlson as representatives of Concierge.  Testimony revealed that Aaron Seehawer, and sometimes Van Carlson, met Ken and Jackie Hutchison,[12] Robert Huff, Joseph Schuler, Anne Graham King and Darius and Donna Bailey at Bailey's office.[13] Van Carlson noted that none of those parties would have become clients of Conciege if Bailey had not introduced them.  That testimony was corroborated by the testimony of Robert Huff, Joseph Schuler, and Anne Graham King, who each testified they were introduced to Aaron Seehawer and Van Carlson by Bailey. Bailey's assistance with Concierge's solicitation of EAM clients was further documented with emails among Bailey, his assistant, Natalia Cornwall, Aaron

---

[12]   Bailey argued that he introduced Ken and Jackie Hutchison to Aaron Seehawer and Van Carlson only for property and casualty insurance purposes, related to tax-planning work Bailey was doing for them.  He stated Aaron Seehawer and Van Carlson were aware of the Covenant and that they had ignored his request not to solicit Ken or Jackie Hutchison for financial planning.  The Court finds this testimony unconvincing and irrelevant.  None of the other witnesses testified to those facts.  Further, even if true, Bailey still violated the Covenant, which prohibited providing EAM client information to a third party "for any purpose."

[13]   Van Carlson testified that Bailey introduced those clients to Aaron Seehawer and him "in his capacity as their attorney."  Whether Bailey was wearing his financial-planning hat or lawyer hat is immaterial.  The EAM clients were not introduced to Aaron Seehawer and Van Carlson to get legal work done or because they were Bailey's legal clients.

MEMORANDUM OF DECISION - 10

Seehawer, and Van Carlson.  *See* Exs. 124, 125, 127, 129, 130, 134, 155.

Burks testified that, beginning in March 2011, he began getting transfer notifications from money managers holding EAM client accounts, informing him that the accounts were being transferred to other investment managers.  He was notified that the accounts for Jack Huff, Margaret Schuler, Schulerlane Farms, Ken and Jackie Hutchison, Darius and Donna Bailey, Anne Graham King, Eugene Borman, and Scott Gardner were leaving.  Burks testified that all but Eugene Borman and Scott Gardner transferred to Concierge.[14]  Aaron Seehawer confirmed that Jack Huff, Ken and Jackie Hutchison, Darius and Donna Bailey, Margaret Schuler, and Anne Graham King became Concierge clients.[15]

Burks also testified he was aware Bailey solicited other clients who did not leave EAM, including Durk Irwin, Victor and Jeanne Yamamoto, Donald Lampe, and Dahris Seggerman.  No damages are alleged as arising from interference with these clients.[16]

---

[14]  Eugene Borman transferred to an investment manager in Arizona, and Burks did not know where Scott Gardner transferred.

[15]  Aaron Seehawer made conflicting statements about Darius and Donna Bailey being clients.  Aaron Seehawer said Darius Bailey became a client on approximately February 7, 2011, but later said he was not a client.  The Court notes that the exchange in which Aaron Seehawer stated Darius Bailey was not a client was unclear in terms of whether Aaron Seehawer was discussing whether the parties in question were current clients, or whether they had ever been clients.  The Court finds persuasive Aaron Seehawer's specific statement recognizing the date Darius Bailey became a Concierge client.

[16]  The solicitation of EAM clients and interference with EAM's business violates the

(continued...)

MEMORANDUM OF DECISION - 11

Bailey sold an annuity to EAM client David McWilliams in February 2011.

*See* Ex. 119 at 2.  Shortly thereafter, David McWilliams consulted Burks with

concerns about that annuity.  In November 2011, Burks became a servicing agent

on David McWilliams' annuity, but received no compensation related to it.

Ex. 119 at 1.  Burks testified that, according to the documents he received as the

servicing agent on the annuity, Bailey received a $28,000 commission as a result

of that sale.

Bailey also continued to contact EAM clients with marketing materials.

For instance, between February and May 2012, he sent Burks' parents and Donald

Lampe invitations to complimentary dinners where he would present an

educational seminar and recruit new clients.  *See* Ex. 142.  Some of the invitations

explicitly included language about financial and investment planning.[17]  Ex. 142 at

1–2.  A handout and a PowerPoint slide from one of the seminars indicated that

Bailey was soliciting clients for financial and investment planning, not just for

legal services.  Ex. 143 at 10–11.

------

[16] (...continued)
Covenant even in the absence of damages.  Despite no compensatory damages arising from the
solicitation of those clients, Plaintiffs argue the solicitation—some of which occurred after the
state court determined Bailey had breached the Covenant and even after commencement of the
bankruptcy case—is relevant to the issue of intent, and establishes a need for punitive damages to
deter further breaches by Bailey.

[17] Apparently, Bailey used a mail marketing firm to send out invitations to marketing
events.  Burks testified that, based on his use of such services in the past, the party presenting the
event was responsible for "scrubbing" the mailing list proposed by the marketing firm before the
invitations were sent, in order to delete parties who should not be contacted.

MEMORANDUM OF DECISION - 12

Bailey's contact with EAM clients continued even after the commencement of the bankruptcy and filing of the adversary proceeding. On January 4, 2013, Bailey contacted Victor and Jeanne Yamamoto to update their estate plan, and included marketing materials that suggested they purchase long-term care insurance or annuities. Ex. 160.

**D.      Department of Insurance complaint**

In March 2011, after the stock purchase, Bailey manipulated Anne Graham King into filing a complaint against Burks with the Department of Insurance. Bailey's staff prepared an affidavit for her, Ex. 116 at 1–2, which Bailey reviewed. According to Anne Graham King, she signed it without being aware of the contents, doing so simply because Bailey, as her attorney, recommended she sign it.[18] The affidavit alleged Burks lied to Anne Graham King by telling her that Bailey had filed for bankruptcy to induce her to change the agent on an annuity from Bailey to Burks. Bailey also submitted his own affidavit supporting the charges, which alleged that Burks had himself named writing agent on the annuity. Ex. 117.

---

[18] Anne Graham King testified she signed the affidavit "on the advice of Todd, that um . . . Well, I think I heard from Brian about something on [Todd] going bankrupt, and so then, when I went . . . A few days later I went back over to the office, and then Todd told me that he would like me to sign this affidavit. And I said what is it for, and he said, because, he said he was not going bankrupt, and he wanted me to relinquish my affair with Brian. So what could I do? I mean, he was my lawyer. So I took Todd's advice as a lawyer, because I didn't know anything about it." She also testified that she was not aware of the affidavit's contents or purpose.

MEMORANDUM OF DECISION - 13

After receiving notice of the complaint from the Department of Insurance,

Ex. 116 at 3, Burks submitted his response, Ex. 118.  In it and in his testimony, he

explained that he had merely helped Anne Graham King add him as an additional

servicing agent on the annuity so that he could help complete some of her

requests.  Ex. 118 at 1.  He explained he was not named as the writing agent and

received no commission from the annuity.  Ex. 118 at 2.  He also clarified that

some of the confusion about his statements may have come from the fact that both

EAM and Emerald Financial Advisors, Inc. had been doing business as Emerald

Financial Advisors.  Ex. 118 at 3.

No disciplinary action was taken against Burks, and the Department of

Insurance complaint was dismissed.

## E.    State Court litigation

On April 18, 2011, Plaintiffs sued Bailey in the Idaho Third Judicial

District Court, Canyon County ("State Court"), Case No. CV 2011-3873 ("State

Court Case").[19]  In the State Court Case, Plaintiffs asserted claims for: 1) breach of

---

[19] Except for one order, *see* Ex. No. 153, the records from the State Court Case were not offered at trial.  Some were, however, included in the submissions supporting Plaintiffs motion for partial summary judgment in this adversary proceeding.  *See* Doc. No. 11-2.  Pursuant to Fed. R. Evid. 201, the Court takes judicial notice of the docket of the State Court Case, *id.* at 6–9, and the State Court's Order re: Plaintiffs' Motion for Partial Summary Judgment, *id.* at 11–13.  *See Dawson v. Mahoney,* 451 F.3d 550, 551 (9th Cir. 2006) (allowing judicial notice of state court orders and proceedings in federal court); *United States v. Black,* 482 F.3d 1035, 1041 (9th Cir. 2007) (records, including judgments and other court documents, are proper subjects of judicial notice).

MEMORANDUM OF DECISION - 14

contract; 2) breach of covenant not to compete; 3) tortious interference with a

contract; 4) tortious interference with prospective economic advantage;

5) defamation; 6) slander; 7) civil conspiracy; and 8) injunctive relief.

Plaintiffs filed a motion for partial summary judgment in the State Court

Case on October 17, 2011.  The State Court granted that motion on January 11,

2012, holding Bailey had breached the covenant not to compete and was liable for

damages resulting from that breach.  At that time, the State Court also entered an

order granting Plaintiffs $20.00 in costs and $2,429.00 in attorneys' fees.  Ex. 153.

On May 24, 2012, the State Court allowed Plaintiffs to amend their complaint to

include punitive damages, in accordance with Idaho Code § 6-1604(2).[20]  The

State Court Case was stayed when Bailey filed his bankruptcy petition on August

21, 2012.

## DISCUSSION AND DISPOSITION

To except a debt from discharge under § 523, a party must prove its case by

a preponderance of the evidence.  *See Grogan v. Garner*, 498 U.S. 279, 291

(1991).  Exceptions to discharge should be strictly construed in favor of the debtor

to fulfill the Code's purpose of giving debtors a fresh start.  *Snoke v. Riso (In re*

*Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992).  But "[w]hile a central purpose of

---

[20] Under Idaho Code § 6-1604(2), Plaintiffs are not allowed to file a complaint seeking
punitive damages, but must instead move to amend the complaint to include punitive damages.
This procedural requirement is discussed further below.

MEMORANDUM OF DECISION - 15

bankruptcy is to allow an honest but unfortunate debtor a fresh start, 'a dishonest

debtor, on the other hand, will not benefit from his wrongdoing.'" *Huskey v.*

*Tolman (In re Tolman)*, 491 B.R. 138, 149 (Bankr. D. Idaho 2013) (quoting *Apte*

*v. Japra (In re Apte),* 96 F.3d 1319, 1322 (9th Cir. 1996)).

## A.      Nondischargeability under § 523(a)(2)(A)

Plaintiffs allege fraud under § 523(a)(2)(A), which holds nondischargeable

debts due to "false pretenses, a false representation, or actual fraud."  To establish

a debt is nondischargeable under that section, Plaintiffs must prove five elements:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the
> debtor; (2) knowledge of the falsity or deceptiveness of his statement
> or conduct; (3) an intent to deceive; (4) justifiable reliance by the
> creditor on the debtor's statement or conduct; and (5) damage to the
> creditor proximately caused by its reliance on the debtor's statement or
> conduct.

*Depue v. Cox (In re Cox)*, 462 B.R. 746, 756 (Bankr. D. Idaho 2011) (quoting

*Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 (9th Cir. 2001)).

### 1.      Misrepresentation

Plaintiffs allege Bailey made a representation by entering into the

Covenant.  Entering a contract implies a "representation of intent to honor its

terms."  *Sharma v. Salcido (In re Sharma)*, 2013 WL 1987351, at *10 (9th Cir.

BAP May 14, 2013).[21]  Bailey does not dispute that he entered such a contract.

---

[21] This Court has previously recognized that promissory fraud satisfies § 523(a)(2)(A)
when the maker of an express promise knew it to be false and had no intent or ability to perform.
*See Cox*, 462 B.R. at 759; *Fetty v. Carlson (In re Carlson)*, 426 B.R. 840, 854 n.18 (Bankr. D.

(continued...)

MEMORANDUM OF DECISION - 16

Indeed, the contract was memorialized in writing and signed by Bailey.  The Court concludes Bailey represented he would abide by the Covenant's terms.

### 2.   Knowledge of falsity and intent to deceive

Plaintiffs must also prove Bailey both knew that his representation was false and intended to deceive Burks with it.  To establish knowing falsity, Plaintiffs must establish Bailey either knew the representation was false or recklessly disregarded the truth when he made the representation.  *Sharma*, 2013 WL 1987351, at *10 (citing *Ghomeshi v. Sabban (In re Sabban),* 600 F.3d 1219, 1222 (9th Cir. 2010); *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch),* 237 B.R. 160, 167 (9th Cir. BAP 1999)).  "Intent to deceive may be inferred from the totality of circumstances." *Id.* (citing *Citibank (S.D.), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1087 (9th Cir. 1996)).

Plaintiffs rarely present direct evidence of a defendant's knowledge and fraudulent intent, and instead must rely on circumstantial evidence to prove these elements.  *Carlson*, 426 B.R. at 855 (citing *Cowen v. Kennedy (In re Kennedy),* 108 F.3d 1015, 1018 (9th Cir. 1997)).  "The debtor's assertions of an honest intent must be weighed against natural inferences from admitted facts." *Sharma*, 2013 WL 1987351, at *10 (quoting 4 Collier on Bankruptcy ¶ 523.08[2][e][ii] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013)) (internal quotation marks

---

[21] (...continued)
Idaho 2010).

MEMORANDUM OF DECISION - 17

omitted).

In this case, Bailey argued he did not have the requisite knowledge and intent because he believed he was not violating the Covenant under his interpretation of it.[22]  He argued he believed the exception in the Covenant that allowed him to continue providing legal services to EAM's clients permitted his actions.  For instance, Bailey argued he was referring clients to Concierge in his legal capacity as an attorney helping his clients with their estate planning; he ignores, though, the provision in the Covenant prohibiting "provid[ing] Client names or information to any other individual or company for any purpose" as well as the nature of Concierge's services.  Basically, Bailey argues that the legal services exception trumps all the prohibitions of specific acts in the Covenant.

This interpretation of the Covenant is distorted past the point of reason.  If Bailey could undertake the specifically prohibited actions under the guise of providing legal services, the Covenant would effectively be meaningless.  Bailey would only need to couch his violations as stemming from or related (however tangentially) to legal services to avoid being bound by the Covenant.  This attenuated argument would be unpersuasive sharp lawyering if advanced by an

---

[22] Bailey's argument, which was not particularly clear to begin with, often moved beyond that he lacked actionable intent into an argument that he did not in fact violate the Covenant.  The Court finds that argument baseless.  The State Court decided Bailey had breached the Covenant in its ruling on Plaintiffs' summary judgment motion in the State Court Case.  This Court recognized the preclusive effect of that decision in its ruling on Plaintiffs' partial summary judgment motion in this adversary proceeding.  Doc. No. 21.

MEMORANDUM OF DECISION - 18

attorney not involved with the contract.  When advanced by Bailey, who negotiated the contract and was bound by the Covenant, it is indicative of intent.

The weight of the evidence preponderates in favor of finding that Bailey knew his representation was false and did not intend to fulfill it.  Aaron Seehawer and Van Carlson both testified that when they and Bailey discussed Bailey becoming an IAR through Concierge, Bailey indicated he planned "to bring several clients" to their firm.  The September 2, 2010 email from Aaron Seehawer to Bailey established those discussions occurred at the very same time Bailey was negotiating the Covenant.  While Bailey did not specifically name the clients he intended to bring, the fact that he introduced several EAM clients to Aaron Seehawer and Van Carlson persuades the Court that he intended to solicit those clients in September 2010.

Bailey's intent to deceive Burks is further underscored by the timing of the transfers of Jack Huff's accounts.  Bailey had already approached Jack Huff about leaving EAM before he began negotiating the Covenant, and he continued that course of action after he signed the Stock Purchase Agreement.[23]

The Court finds Plaintiffs have established Bailey knew the representations he made in the Covenant were false, and he intended to deceive Burks in order to

---

[23] Ironically, these facts were originally presented by Bailey, to support an argument that he did not breach the Covenant as to Jack Huff.  Bailey argues he did not breach because he initially contacted Jack Huff about transferring to Concierge in summer 2010, *before* entering the Covenant.  That argument disregards the fact that the account transfers were not completed until December 2010, well after entering the Covenant.

MEMORANDUM OF DECISION - 19

induce him to enter the Stock Purchase Agreement.

### 3.  Justifiable reliance

Plaintiffs must also establish they justifiably relied on Bailey's

representation.  Justifiable reliance is a subjective standard, which is "a matter of

the qualities and characteristics of the particular plaintiff, and the circumstances of

the particular case."  *Sharma*, 2013 WL 1987351, at *11 (quoting *Eashai*, 87 F.3d

at 1090) (internal quotation marks omitted).  A creditor generally need not

investigate the truth of the representation, but also cannot ignore red flags.  *Id.*  A

creditor "cannot purport to rely on preposterous representations or close his eyes

to avoid discovery of the truth."  *Eashai,* 87 F.3d at 1090–91 (quoting *Romesh*

*Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte)*, 180 B.R. 223, 229 (9th Cir. BAP

1995)).

Here, Burks testified that he did indeed rely on Bailey's representation in

the Covenant.  He explained that he would not have agreed to purchase Bailey's

stock without the Covenant, because there would be no protection of EAM's

clients, the company's sole assets.  In other words, without the Covenant, Bailey's

stock was worthless and the Stock Purchase Agreement made no sense.

Burks argued his reliance was justified given the extensive negotiation over

the Covenant.  He also noted that Bailey was a licensed attorney, and Bailey

expressly told him that violating the Covenant would be illegal and he could be

MEMORANDUM OF DECISION - 20

disbarred.[24]  Burks and Bailey negotiated at arm's length for the Covenant, and

importantly, Bailey negotiated to keep the scope of the Covenant narrow,

suggesting an intent to honor it, as well as encouraging Burks to rely on the

Covenant and agree to its terms.  There were no red flags to alert Burks that Bailey

did not intend to abide by his promise and honor his contract.  The Court

concludes that Plaintiffs justifiably relied on Bailey's representation.

### 4.    Causation and compensatory damages

Finally, to prevail on the § 523(a)(2)(A) claim, Plaintiffs must establish that

Burks' reliance on Bailey's representations caused the damages he asserts.  *Spigot*

*Res., Inc. v. Radow (In re Radow)*, 2013 WL 1397342, at *6 (9th Cir. BAP Apr. 2,

2013) (citing *Britton v. Price (In re Britton),* 950 F.2d 602, 604 (9th Cir. 1991)).

In terms of the § 523(a)(2)(A) claim, Plaintiffs assert that they were damaged in

the amount of $100,280, which includes the $2,500 paid for the Covenant, the

$85,000 down payment on the stock purchase, and $12,780 in interest on a

---

[24]  Burks also argued that Bailey, as his partner, owed him a fiduciary duty, and so it was reasonable to rely on his representations.  Burks and Bailey were not partners, but shareholders in a closely-held corporation.  Under Idaho law, generally shareholders do not owe each other a fiduciary duty regarding their individual private stock holdings, although a majority shareholder owes a minority shareholder a fiduciary duty when negotiating a stock purchase on unequal terms.  *Hines v. Hines*, 934 P.2d 20, 23–24 (Idaho 1997).  Burks and Bailey each owned half of the outstanding shares, and were negotiating on equal terms at arm's length.  The Court concludes that Burks did not present sufficient evidence to establish that Bailey owed him a fiduciary duty.  However, justifiable reliance is shown without the need for such a finding.

$75,000 loan Burks incurred to make the down payment.  Ex. 146 at 2.[25]

Bailey argues that Plaintiffs' § 523(a)(2)(A) damages should be limited to those attributable to the loss of goodwill from the breach of the Covenant, which Bailey views as established in amount by the $2,500 paid for the Covenant.[26]  He relies on *Dunn v. Ward*, 670 P.2d 59, 61 (Idaho Ct. App. 1983), in which the Idaho Court of Appeals established that impairment of goodwill and lost profits are the proper measure of damages for breach of a covenant not to compete.  However, that argument ignores the nature of the action.  The damages from the § 523(a)(2)(A) action arise not from the breach of the Covenant, but from the fraudulent misrepresentation Bailey made when he entered the Covenant without intent to abide by it.  Plaintiffs are entitled to all damages actually and proximately caused by Bailey's misrepresentation.  *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998) (holding that damages in a § 523(a)(2)(A) action encompass "any liability

---

[25] Burks' statement of damages also requests damages for the remaining $25,000 promissory note that Burks owes to Bailey.  Ex. 146 at 2.  In her closing argument, Burks' counsel clarified that, since Burks has not made any payments on that note, such amount can simply be offset.  *See also* note 26 below.

[26] Bailey also argued that Burks had breached the contract by failing to pay the outstanding $25,000 and, thus, pursuant to *Fajen v. Powlus*, 561 P.2d 388 (Idaho 1977), Burks could not seek damages because he had already himself breached.  That argument, however, ignores the facts.  The promissory note from Burks to Bailey, Ex. 101, says the $25,000 and contractual interest was due on September 15, 2011.  This was more than five months after Plaintiffs filed the State Court Case.  Burks discontinued performance after Bailey's breach, which does not preclude Burks from pursuing the damages he actually suffered.  The outstanding $25,000 should be offset against the full purchase price, reducing it from $110,000 to $85,000.

MEMORANDUM OF DECISION - 22

arising from money, property, etc., that is fraudulently obtained," there including treble damages and attorneys' fees).

The Court must determine whether Bailey's misrepresentations caused the damages claimed by Plaintiffs. Causation requires both (1) causation in fact, which means the misrepresentations were "a substantial factor in determining the course of conduct" that resulted in damages, and (2) legal causation, which requires a creditor's loss to "reasonably be expected to result." *Radow*, 2013 WL 1397342, at *6 (citing *Beneficial Cal., Inc. v. Brown (In re Brown),* 217 B.R. 857, 862 (Bankr. S.D. Cal. 1998)).

Plaintiffs established both causation in fact and legal causation for the claimed damages. Burks' testimony established the Covenant was a substantial factor in his decision to enter the Stock Purchase Agreement. Indeed, without the Covenant, Burks would not have purchased Bailey's stock at all, because the stock would be worthless without protection of EAM's client base.

Additionally, Burks' testimony illustrated that those damages could be reasonably expected to result from Bailey's misrepresentations. The purchase price was negotiated and set forth in the contract. The $85,000 down payment, and any interest from financing some or all of that payment, would be reasonably expected in a transaction of this magnitude.

MEMORANDUM OF DECISION - 23

Plaintiffs' summary exhibit, Ex. 146, when combined with his testimony, adequately established the amount of damages Burks suffered due to the § 523(a)(2)(A) claim. Burks paid Bailey $85,000 as a down payment, and must also pay $12,780 in interest on the $75,000 note he took out to make the down payment. EAM paid $2,500 for the Covenant. The Court concludes Bailey owes Plaintiffs a nondischargeable debt of $100,280 under § 523(a)(2)(A).

**B.    Nondischargeability under § 523(a)(6)**

Plaintiffs also seek to establish Bailey owes them a nondischargeable debt for "willful and malicious injury by the debtor" under § 523(a)(6). Plaintiffs must prove both willfulness and maliciousness to prevail on this claim. *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010).

**1.    Type of injury contemplated by § 523(a)(6)**

Before determining whether the debtor acted willfully and maliciously, the Court must first determine whether the injury is of the type that § 523(a)(6) contemplates. *Bank of Idaho v. Powell (In re Powell)*, 2012 WL 2373405, at *4 (Bankr. D. Idaho June 22, 2012) (citing *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1206–09 (9th Cir. 2001)). Generally, an injury due to breach of contract—even an intentional breach—is not held nondischargeable under § 523(a)(6) "unless accompanied by willful and malicious *tortious* conduct." *Id.*

MEMORANDUM OF DECISION - 24

(citing *Jercich*, 238 F.3d at 1205; *Lockerby v. Sierra*, 535 F.3d 1038, 1040–42

(9th Cir. 2008)).  Bankruptcy courts look to state law to determine whether acts

constitute tortious conduct.  *Lockerby*, 535 F.3d at 1041 (citing *Jercich*, 238 F.3d

at 1206).  In argument, Plaintiffs alleged that Bailey's breach of the Stock

Purchase Agreement was accompanied by tortious interference with an economic

advantage.[27]

Under Idaho law, tortious interference with a prospective economic

advantage has five elements:

> (1) The existence of a valid economic expectancy; (2) knowledge of the
> expectancy on the part of the interferer; (3) intentional interference
> inducing termination of the expectancy; (4) the interference was
> wrongful by some measure beyond the fact of the interference itself
> (i.e. that the defendant interfered for an improper purpose or improper
> means) and (5) resulting damage to the plaintiff whose expectancy has
> been disrupted.

*Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Trust*, 177 P.3d 955, 964

(Idaho 2008) (quoting *Highland Enters., Inc. v. Barker,* 986 P.2d 996, 1004 (Idaho

1999)) (internal quotation marks omitted).

Here, Burks and Bailey discussed each of EAM's existing clients in order

to value Bailey's EAM stock.  This establishes Burks had an economic expectancy

---

[27] Plaintiffs also alleged Bailey's breach of the Covenant was accompanied by tortious
interference with a contract, slander, and defamation.  Because the Court determines below that
Bailey's conduct constituted tortious interference with prospective economic advantage, the
Court need not examine whether his conduct also constituted the other alleged torts.

MEMORANDUM OF DECISION - 25

in the poached clients, and that Bailey knew of that expectancy.  Additionally,

because Bailey introduced EAM clients to Aaron Seehawer and Van Carlson and

many of them subsequently left EAM for Concierge, Plaintiffs have established

that Bailey's interference resulted in termination of the expectancy.[28]  The first

three factors are met.

In regard to the fourth factor, Plaintiffs must establish the wrongfulness of

the interference.  *Id.* (citing *Lexington Heights Dev., LLC v. Crandlemire,* 92 P.3d

526, 536 (2004)).  Interference may be wrongful due to the interferer's

(1) improper motive to injure the plaintiff, or (2) improper means of interfering.

*Syringa Networks, LLC v. Idaho Dep't of Admin.*, 2013 WL 1276493, at *8 (Idaho

Mar. 29, 2013).

In discussing what constitutes improper means of interference, the Idaho

Supreme Court relied on an Oregon Supreme Court case, *Top Service Body Shop,*

*Inc. v. Allstate Ins. Co.*, 582 P.2d 1365 (Or. 1978) (en banc), stating:

> [T]he *Top Service* court stated that improper means may be wrongful
> by reason of a statute or other regulation, or a recognized rule of
> common law, or an established standard of a trade or profession. . . .
> Some additional examples of improper means cited by the *Top Service*
> court include violence, threats or other intimidation, deceit or
> misrepresentation, bribery, unfounded litigation, defamation, or
> disparaging falsehood.

---

[28]  The interference with individual clients and damages related thereto are discussed in
detail below.

MEMORANDUM OF DECISION - 26

*Downey Chiropractic Clinic v. Nampa Rest. Corp.*, 900 P.2d 191, 194 (Idaho 1995) (citing *Top Service*, 582 P.2d at 1371 & n.11) (citations omitted).  In establishing that list, the *Top Service* court referred to the Restatement (Second) of Torts §§ 766, 767, which in turn recognizes that the propriety of the means "is determined in the light of all the factors present," and that what may be wrongful in one situation may not be wrongful in another.  Restatement (Second) of Torts § 767, cmt. c (2012).[29]

Bailey used "wrongful means" to interfere with Plaintiffs' economic expectancy.  By interfering with EAM clients and breaching the Covenant, Bailey violated recognized common law rules as the breach furthered his fraudulent misrepresentations and deceit.

Additionally, the Court finds Bailey's breach of the Covenant was a "wrongful means" regardless of whether he initially entered the Covenant fraudulently.  Although the Court can envision breaches of restrictive covenants that might not constitute "wrongful means," Bailey's acts were sufficiently egregious to qualify.  Bailey intentionally violated his contractual obligation,

---

[29]  Later Idaho Supreme Court cases truncated, without discussion, the definition of improper means to include only acts that were "wrongful by reason of a statute, regulation, recognized common law rule, or an established standard of a trade or profession."  *See, e.g., Yoakum v. Hartford Fire Ins. Co.*, 923 P.2d 416, 423 (Idaho 1996).  However, the term "recognized common law rule" subsumes many of the examples listed in earlier cases.

MEMORANDUM OF DECISION - 27

despite knowing Burks had relied on that provision to justify entering into the

Stock Purchase Agreement.  And Bailey's breach was flagrant in both the scope of

the breach, which lasted for an extended period of time and involved solicitations

of numerous clients, and the disregard it showed for the injury inflicted on

Plaintiffs, which was extensive.  Bailey's violations of the Covenant were not

mere technical breaches, they struck directly at the spirit of the Covenant.  Based

on the circumstances, Bailey's conduct was wrongful beyond the interference

itself.

The Court concludes that Bailey's interference with the EAM clients was

wrongful, and Plaintiffs established Bailey's breach of the Covenant was

accompanied by tortious conduct under Idaho law.[30]  Thus Bailey's acts fall within

the ambit of § 523(a)(6).

### 2.    Willfulness

Returning to the § 523(a)(6) analysis, Plaintiffs must establish by a

preponderance of the evidence that Bailey both willfully and maliciously injured

them.  "A 'willful' injury is a 'deliberate or intentional *injury,* not merely a

deliberate or intentional *act* that leads to injury.'"  *Barboza v. New Form, Inc. (In*

---

[30] To the extent that tortious interference with a prospective economic advantage requires damages as an element of the claim, that element is subsumed within the discussion below establishing damages for the § 523(a)(6) claim as a whole.

MEMORANDUM OF DECISION - 28

*re Barboza),* 545 F.3d 702, 706 (9th Cir. 2008) (quoting *Kawaauhau v. Geiger,*

523 U.S. 57, 61 (1998)).  Willfulness can be established when "the debtor has a

subjective motive to inflict injury or when the debtor believes that injury is

substantially certain to result from his own conduct."  *Ormsby*, 591 F.3d at 1206

(quoting *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002)).

Under this analysis, the debtor is presumed to know the natural

consequences of his actions.  *Id.*  In *Thiara v. Spycher Bros. (In re Thiara)*, 285

B.R. 420 (9th Cir. BAP 2002), in connection with willfulness under § 523(a)(6),

the panel stated: "[T]he debtor's actual knowledge can be found through

circumstantial evidence."  *Id.* at 432 (citing *Su*, 290 F.3d at 1146 n.6.)  It also

noted, "Subjective intent may be gleaned from objective factors."  *Id.* (citing

*Nahman v. Jacks (In re Jacks)*, 266 B.R. 728, 741 (9th Cir. BAP 2001)).

In the case at bar, Bailey clearly intended to bolster his own business.  It is

unclear whether Bailey did so with a primary motivation or goal to injure

Plaintiffs, but the Court concludes Bailey was aware that injury was substantially

certain to result from his conduct.  Due to his work at EAM and the negotiations

of the Stock Purchase Agreement, Bailey knew David McWilliams, Anne Graham

King, Margaret Schuler, Schulerlane Farms, Ken and Jackie Hutchison, and Jack

Huff were EAM clients, and that Plaintiffs had an economic expectancy in the

MEMORANDUM OF DECISION - 29

income from managing those clients' investments.  He also knew that by bringing

EAM clients to Concierge where he would share financially, he would necessarily

be taking those clients from EAM and Burks, thus injuring them.  Therefore,

Plaintiffs established the injury was willful.

### 3.    Maliciousness

Plaintiffs must also establish the injury was malicious.  "A malicious injury

involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes

injury, and (4) is done without just cause or excuse."  *Ormsby*, 591 F.3d at 1207

(quoting *Jercich*, 238 F.3d at 1209) (internal quotation marks omitted).  This

definition does not require a plaintiff to establish "personal hatred, spite, or ill-

will."  *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 791 (9th Cir. 1997)

(citation omitted).

As discussed above, Bailey's solicitation of EAM clients and introduction

of EAM clients to Van Carlson and Aaron Seehawer was wrongful.  There is no

question that Bailey did those acts intentionally; he did not accidentally solicit

clients or mistakenly provide their information to Concierge.  His successful

attempts to lure away EAM clients could not help but injure the economic

expectancy that both EAM, and Burks as EAM's sole shareholder, held in the fees

expected from those clients.  And as this Court has discussed, Bailey's excuse that

MEMORANDUM OF DECISION - 30

he did not believe he was violating the Covenant because he was acting in his capacity as an attorney was not a reasonable interpretation of the Covenant, especially under the whole of the evidence.  The Court finds no just cause or excuse for his actions suggested or proven.

Bailey's injury to Plaintiffs was both willful and malicious, and therefore any provable damages caused by those acts are nondischargeable under § 523(a)(6).

### 4.    Causation and compensatory damages

Plaintiffs assert they are entitled to the fees they would have earned from the clients Bailey solicited away and the commission on the annuity Bailey sold to McWilliams.  Plaintiffs also assert they are entitled to the attorneys' fees and costs incurred litigating Bailey's breach of the Covenant in State Court.

The proper amount of damages from breach of a covenant not to compete is impairment of goodwill and the plaintiff's lost profits.  *Gen. Auto Parts Co. v. Genuine Parts Co.*, 979 P.2d 1207, 1213 (Idaho 1999) (citing *Vancil v. Anderson*, 227 P.2d 74, 79 (Idaho 1951); *Dunn*, 670 P.2d at 61)).  While lost profits need be proved with "reasonable certainty" and removed from "the realm of speculation," *Dunn*, 670 P.2d at 61–62, "[t]he mere fact that it is difficult to arrive at [an] exact amount of damages, where it is shown that damages resulted, does not mean that

MEMORANDUM OF DECISION - 31

damages may not be awarded; it is for the trier-of-fact to fix the amount," *Trilogy Network Sys., Inc. v. Johnson*, 172 P.3d 1119, 1121 (Idaho 2007) (second alteration in original) (quoting *Bumgarner v. Bumgarner*, 862 P.2d 321, 332 (Idaho Ct. App. 1993)) (internal quotation marks omitted).[31]

In order to determine whether Plaintiffs established the amount of damages and requisite causation, the Court must examine each segment of claimed damages separately.

### a.      Anne Graham King's management fees

Plaintiffs claim they are entitled to the management fees Anne Graham King would have paid to EAM had she continued to be an EAM client for the remainder of the term of the Covenant.  Plaintiffs presented sufficient evidence to establish that Anne Graham King was an EAM client on September 17, 2010, that Bailey breached the covenant regarding Anne Graham King by introducing her to Aaron Seehawer and Van Carlson, and that she terminated her business relationship with Plaintiffs due to Bailey's interference.  Her testimony made clear that she would not have left EAM but for the instructions of her lawyer, Bailey.

Plaintiffs presented sufficient evidence to establish the amount of the

---

[31]  Bailey argued that Plaintiffs failed to establish their lost profits because they did not present evidence of their costs.  The Court infers, from the nature of EAM's business providing a financial and investment planning service, that any per-client costs are *de minimis*.

MEMORANDUM OF DECISION - 32

management fee lost due to Bailey's solicitation of Anne Graham King at $1,784.44. *See* Ex. 146 at 1. Plaintiffs' summary exhibit included the value of each account as of the transfer out date, the date it was transferred, and the annual fee rate. From those numbers, Burks was able to calculate the number of days of lost revenue (until the expiration of the Covenant), and the amount of the management fees lost during that time.[32] Plaintiffs established the causation and amount of damages relating to Anne Graham King by a preponderance of the evidence, and are entitled to the requested amount of damages.

### b.    Margaret Schuler and Schulerlane Farms' fees

Plaintiffs additionally seek lost management fees that would have been paid by Margaret Schuler and Schulerlane Farms had they continued to be EAM clients for the remainder of the Covenant's term. Plaintiffs successfully established that Margaret Schuler and Schulerlane Farmers were EAM clients at the time of the Stock Purchase Agreement. Plaintiffs also established that Bailey interfered with EAM's relationship with Margaret Schuler and Schulerlane Farms by introducing Joseph Schuler, who oversaw those accounts, to Aaron Seehawer and Van Carlson.

But Plaintiffs failed to established that Bailey's interference caused the

---

[32] Burks' calculations for Anne Graham King were as follows: a 1.25% management fee, on an account of $32,832.10 for 921 days, an account of $1,524.00 for 979 days, and an account of $30,356.97 for 839 days, would result in a total of $1,784.44. Ex. 146 at 1

MEMORANDUM OF DECISION - 33

accounts of Margaret Schuler and Schulerlane Farms to transfer to Concierge.

Joseph Schuler testified that he approached Bailey about moving the accounts

away from EAM. While his decision to move the accounts *to Concierge* was

likely influenced by Bailey's actions, the Court is persuaded that Joseph Schuler

would have moved the accounts *from EAM* regardless. Plaintiffs did not establish

that these damages were caused by Bailey's actions, and thus are not entitled to

hold them nondischargeable.

<h3 style="text-align:center">c.      Jack Huff's management fees</h3>

Plaintiffs also seek to recover lost management fees for the accounts of

Jack Huff. Plaintiffs' evidence established that Jack Huff was an EAM client on

September 17, 2010, and that Bailey introduced him to Aaron Seehawer and Van

Carlson. Testimony by Robert Huff indicated his father only began moving his

accounts from EAM after Bailey approached him about moving them, establishing

that Bailey's interference was a substantial factor in Plaintiffs' loss of Jack Huff as

a client.

Plaintiffs' summary exhibit and supporting testimony established the

amount of lost fees for managing Jack Huff's accounts is $28,817.87. Ex. 146 at

1. The exhibit showed the management fee rate, the numbers of days lost on each

account, and the amount of the account when transferred, from which the lost fees

MEMORANDUM OF DECISION - 34

can be calculated.[33]  The Court concludes Bailey owes the Plaintiffs a nondischargeable debt of $28,817.87 for the loss of Jack Huff's accounts.

### d.    Ken and Jackie Hutchison's management fees

Plaintiffs also seek to hold nondischargeable lost management fees for the accounts of Ken and Jackie Hutchison.  Plaintiffs' evidence established that Ken and Jackie Hutchison were EAM clients on September 17, 2010, and that Bailey introduced them to Aaron Seehawer and Van Carlson.  Ken and Jackie Hutchison then moved their accounts to Concierge.  From that fact, the Court can infer that Bailey's introduction was a substantial factor in Ken and Jackie Hutchison leaving EAM.  And unlike with Margaret Schuler and Schulerlane Farms, there was no testimony or other evidence to negate that inference.

Plaintiffs' summary and Burks' testimony established the management fee rate on Ken and Jackie Hutchison's accounts, the numbers of days lost on each account, and the amount of each account when transferred.  From those figures, the amount of lost fees for managing Ken and Jackie Hutchison's accounts can be calculated at $1,886.34.  Ex. 146 at 1.[34]  The Court concludes Bailey owes the

---

[33]  Burks' calculations for Jack Huff were as follows: a 1.0% management fee, on an account of $560,498.35 for 995 days, and on an account of $493,662.64 for 1001 days, would result in a total of $28,817.87.  Ex. 146 at 1.

[34]  Burks' calculations for Ken and Jackie Hutchison were as follows: a 1.0% management fee, on the "Jackie Hutchison" account of $35,746.60 for 960 days, and on the "Kenneth Hutchison" account of $36,390.71 for 949 days, would result in a total of $1,886.34. Ex. 146 at 1.

MEMORANDUM OF DECISION - 35

Plaintiffs a nondischargeable debt in that amount for the loss of Ken and Jackie Hutchison's accounts.

### e.      Darius and Donna Bailey's management fees

Plaintiffs also seek to recover lost management fees for the accounts of Darius and Donna Bailey.  The evidence established that Darius and Donna Bailey were EAM clients when the Stock Purchase Agreement went into effect.  The evidence also establishes that Bailey introduced them to Aaron Seehawer and Van Carlson, and provided information about them to Concierge.

While Darius and Donna Bailey then moved their accounts to Concierge, the Court will not infer that Bailey's interference was a substantial factor in their doing so.  Darius' large number of referrals to Bailey established that they had a close business relationship.  And the sale of Bailey's EAM stock and the subsequent events proved to be particularly acrimonious.  Here, the Court can infer that Darius and Donna Bailey, as Bailey's parents and close business contacts, would not have remained in a business relationship with someone so pugnacious toward their son, even if Bailey had not introduced them to Aaron Seehawer and Van Carlson.  Plaintiffs bore the burden of establishing that Bailey's actions caused EAM to lose Darius and Donna Bailey's accounts, but failed to meet that burden.  The Court will not award damages to Plaintiffs for the loss of the accounts of Darius and Donna Bailey.

MEMORANDUM OF DECISION - 36

### f.     Management fees after termination of the Covenant

Plaintiffs also seek $42,587.00 in damages for an additional year of lost

management fees after termination of the Covenant.  Ex. 146 at 2; Ex. 152.  The

Court determines these damages are too speculative.  Plaintiffs provided no

justification for the arbitrary one year term of additional damages.  And beyond

Burks' bald assertion that EAM's clients would have continued with the company

for "a very long time" absent Bailey's interference, Plaintiffs presented no

evidence of that fact.

Indeed, the body of the evidence establishes the opposite is true.  As soon

as the Covenant expired, Bailey would have been free to solicit EAM clients.

And, as evidenced by what actually happened in this case, he was successful in

persuading some of those clients to leave EAM.  Plaintiffs did not establish the

solicited EAM clients would have remained with EAM for an additional year after

the Covenant's expiration with the "reasonable certainty" required to remove the

damages from the realm of speculation.

### g.     David McWilliams' annuity

Plaintiffs claim they are entitled to damages of $28,000, the amount of the

commission Bailey made on the sale of the annuity to David McWilliams in

February 2011.  As recognized by Bailey, the Idaho Supreme Court has stated:

"The measure of damages is not the amount of profits made by the defendant,

rather it is the amount of profit lost to the plaintiff because of the breach."  *Dunn*,

MEMORANDUM OF DECISION - 37

670 P.2d at 61.

Here, Plaintiffs' evidence established that Bailey wrongly sold the annuity during the term of the Covenant, but not that Burks and EAM would have made such a sale in the absence of Bailey's interference.  While Plaintiffs also established David McWilliams approached Burks with concerns about the annuity Bailey sold him, that evidence does not support the inference that Burks would have sold any annuity to David McWilliams in the absence of Bailey's interference, let alone the same annuity earning the same commission.  No other evidence was provided about the annuity to establish by a preponderance of the evidence that, in the absence of Bailey's interference, Plaintiffs would have sold that particular annuity to David McWilliams.

### h.      State Court costs and attorneys' fees

Plaintiffs also claim they are entitled to the costs and attorneys' fees incurred in the State Court Case as part of their compensatory damages resulting from the breach of the Covenant.  They claim those amounts pursuant to the attorneys' fee provision of the Stock Purchase Agreement.  That provision requires the breaching party to pay "all costs and expenses" incurred by the non-breaching party in "mak[ing] a demand, or otherwise protect[ing] or enforc[ing] his rights."  Ex. 100 at 3.  Costs and expenses includes "court costs and a *reasonable* attorney's fee, including fees and costs incurred in any appeal and in any bankruptcy proceeding."  *Id.* (emphasis added).

MEMORANDUM OF DECISION - 38

The attorneys' fees and costs from the State Court Case are a component of Plaintiffs' compensatory damages, and must be established as such. Under Idaho law, if a contract contains an attorneys' fees provision, the terms of that provision establish the right to such fees. *Lamprecht v. Jordan, LLC*, 75 P.3d 743, 747 (Idaho 2003) (citing *Farm Credit Bank of Spokane v. Wissel*, 836 P.2d 511, 514-15 (Idaho 1992)). When a contractual provision allows *reasonable* attorneys' fees, a court must examine the reasonableness of attorneys' fees under the twelve factors listed in Idaho Rule of Civil Procedure 54(e)(3).[35]  *See Zenner v. Holcomb*, 210 P.3d 552, 558-559 (Idaho 2009) (holding Idaho R. Civ. P. 54(e)(3) is not applicable when the contract provides actual attorneys' fees because the rule conflicts with the terms of the contract). This Court also applies Idaho Rule of

---

[35] Rule 54(e)(3) of the Idaho Rules of Civil Procedure lists twelve factors for determining whether attorneys' fees are reasonable:

    (A) The time and labor required.
    (B) The novelty and difficulty of the questions.
    (C) The skill requisite to perform the legal service properly and the experience and ability of the attorney in the particular field of law.
    (D) The prevailing charges for like work.
    (E) Whether the fee is fixed or contingent.
    (F) The time limitations imposed by the client or the circumstances of the case.
    (G) The amount involved and the results obtained.
    (H) The undesirability of the case.
    (I) The nature and length of the professional relationship with the client.
    (J) Awards in similar cases.
    (K) The reasonable cost of automated legal research (Computer Assisted Legal Research), if the court finds it was reasonably necessary in preparing a party's case.
    (L) Any other factor which the court deems appropriate in the particular case.

Idaho R. Civ. Pro. 54(e)(3).

MEMORANDUM OF DECISION - 39

Civil Procedure 54(e)(3) to determine the reasonableness of attorneys' fees under

Idaho law. *See, e.g., Beach v. Wells Fargo Bank, N.A. (In re Beach)*, 2011 WL

4963003, at *4–7 (Bankr. D. Idaho Oct. 19, 2011).  To determine what costs

incurred in the State Court Case should be awarded, the Court consults Idaho Rule

of Civil Procedure 54(d).

Here, Plaintiffs' summary of their requested damages listed $42,202.50 in

attorneys' fees and $2,330.91 in costs from the State Court Case.  Ex. 152.  While

this summary exhibit was admissible under Federal Rule of Evidence 1006, that

does not mean that it met the requisite burden to establish Plaintiffs' damages.  In

particular, Plaintiff had to establish, per the contract, that the attorneys' fees from

the State Court Case were reasonable.  The Court cannot apply the requisite

factors to determine reasonableness of the fees when it has been presented only

with evidence of a single lump-sum amount, without seeing the line-item charges

or being provided other evidence about fees incurred in the State Court Case.  The

Court similarly cannot determine whether Plaintiffs' costs incurred in the State

Court Case are allowable without knowing what those costs are.

The only other evidence presented regarding fees and costs was an order

from the State Court Case authorizing $20.00 in costs and $2,429.00 in attorneys'

fees.  Ex. 153.  The Court recognizes the preclusive effect of the State Court's

MEMORANDUM OF DECISION - 40

determination of those amounts.[36]  But the remaining amounts of State Court

attorneys' fees and costs remain unjustified.  Plaintiffs failed to establish them as a

component of the requested damages, and Plaintiffs' damages will include only

the $2,449.00 in fees and costs previously awarded by the State Court.

### i.    Other compensatory damages

In addition to damages discussed above, Plaintiffs request damages from

the loss of other accounts and indemnification from a lawsuit.  Plaintiffs request

damages for the loss of the accounts of the "Gjerde Trust," Scott Gardner and

Eugene Borman. The evidence was insufficient to establish who the client was on

the Gjerde Trust, let alone that Bailey interfered with that client.  Scott Gardner

and Eugene Borman transferred their accounts to companies other than Concierge,

which suggests that any interference by Bailey was ineffective, or insufficient to

solicit them to Bailey's chosen financial planner, Concierge.  The Court cannot

award those damages.

Plaintiffs' summary exhibit, Ex. 152, also seeks indemnification for the

"Baker lawsuit" among Plaintiffs' requested damages.  Presumably that request

relates to the lawsuit brought against EAM due to Bailey's conduct that Burks

alluded to during his testimony.  But Plaintiffs put on no evidence about that case,

---

[36] The Court can rely on the State Court's decision that the ordered fees qualify as reasonable under the Idaho Rules of Civil Procedure.  However, Plaintiffs did not introduce into evidence any order granting the balance of the claimed $42,202.50 in attorneys' fees and $2,330.91 in costs.

MEMORANDUM OF DECISION - 41

and so did not establish that the Baker suit fell within the indemnification provision of the Stock Purchase Agreement.  The Court therefore cannot award those damages.

Thus, the Court will award Plaintiffs $1,784.44 for the loss of Anne Graham King's accounts, $28,817.87 for the loss of Jack Huff's accounts, $1,886.34 for the loss of Ken and Jackie Hutchison's accounts and $2,449.00 in State Court fees and costs.  Those awards total $34,937.65 in damages for the § 523(a)(6) violations.

Combining that amount with the $100,280.00 awarded for the violation of § 523(a)(2)(A), Plaintiffs' compensatory damages total $135,217.65.

## C.    Punitive damages

Plaintiffs also seek three times the amount of their requested compensatory damages—over $1 million—in punitive damages.  Bankruptcy courts may award punitive damages in nondischargeability actions.  *See, e.g., Cohen*, 523 U.S. 213 (upholding bankruptcy court's award of treble—i.e., punitive—damages); *Wiggins v. Peachtree Settlement Funding (In re Wiggins)*, 273 B.R. 839, 881–886 (Bankr. D. Idaho 2001) (applying punitive damages provision of Idaho Consumer Protection Act); *Sunclipse, Inc. v. Butcher (In re Butcher)*, 200 B.R. 675, 680 (Bankr. C.D. Cal. 1996) *aff'd,* 226 B.R. 283 (9th Cir. BAP 1998) (applying

MEMORANDUM OF DECISION - 42

California punitive damages statute).[37]

### 1.    Procedural requirements

Federal courts apply the procedural requirements of § 6-1604(2) when awarding punitive damages under Idaho Code § 6-1604.  *See e.g., Collier v. Turner Indus. Grp., L.L.C.*, 797 F. Supp. 2d 1029, 1049 (D. Idaho 2011) (striking punitive damages to the extent they related to state law claims for failure to follow the prescribed procedure); *see also Weekes v. Ohio Nat. Life Assurance Corp.*, 2011 WL 6140967, at *5 (D. Idaho Dec. 9, 2011) (citing *Doe v. Cutter Biological*, 844 F.Supp. 602, 610 (D. Idaho 1994) ("Whether plaintiff should be allowed to amend her complaint to seek punitive damages is a substantive question controlled by Idaho law.").  Under Idaho Code § 6-1604(2), a party may not request punitive damages in the original complaint.  Instead, the party must move to amend the complaint to include punitive damages, and the trial court must then determine whether "the moving party has established at [an evidentiary] hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages."  Idaho Code § 6-1604(2).

Here, Plaintiffs initially pled a cause of action for punitive damages in their adversary complaint.  *See* Doc. No. 1 at 12.  Thus, Plaintiffs did not comply with

---

[37] Plaintiffs cite *Britton*, 950 F.2d at 606, for the proposition that a bankruptcy court may award punitive damages for a claim under § 523(a)(6).  It is inapposite.  While *Britton* did hold that punitive damages are nondischargeable, that case involved a debtor seeking to discharge punitive damages previously awarded by a state court.

MEMORANDUM OF DECISION - 43

Idaho Code § 6-1604(2) in this adversary proceeding.  Instead Plaintiffs argued

they followed the requisite procedure in State Court and were allowed to amend,

and the State Court's determination on that issue should be given preclusive effect.

The Court previously addressed this argument in its ruling on Plaintiffs'

motion for partial summary judgment, stating that the State Court's grant of

permission to amend was insufficiently final be to accorded preclusive effect.

However, the Court now concludes this prior ruling was in error.[38]  The Court

wrongly examined the decision for finality as to a right to *recover* punitive

damages, rather than a right to *seek* punitive damages.  Given the Court's error,

the Court may reexamine the applicability of issue preclusion.[39]

To determine the preclusive effect of a state court ruling, a bankruptcy

court applies the law of the state where the ruling was issued.  *Harmon*, 250 F.3d

at 1245.  Under Idaho law, issue preclusion may be applied if five factors are met:

> (1) the party against whom the earlier decision was asserted had a full
> and fair opportunity to litigate the issue decided in the earlier case;
> (2) the issue decided in the prior litigation was identical to the issue
> presented in the present action; (3) the issue sought to be precluded was
> actually decided in the prior litigation; (4) there was a final judgment

---

[38]  The Court is not precluded from reexamining its prior ruling under the law of the case doctrine.  *See United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (holding a court has discretion to depart from the law of the case where, *inter alia*, the original decision was clearly erroneous).

[39]  Bailey is not prejudiced by the Court's reexamination of this issue.  First, he had the opportunity to present arguments about the applicability of issue preclusion during the pendency of the summary judgment motion.  Second, Bailey argued the merits of punitive damages in his pretrial brief, despite the Court's prior ruling.  *See* Doc. No. 33 at 9–10.

MEMORANDUM OF DECISION - 44

on the merits in the prior litigation; and (5) the party against whom the
issue is asserted was a party or in privity with a party to the litigation.

*Bach v. Bagley*, 229 P.3d 1146, 1157 (2010).  The first, second, third and fifth

factors are clearly met.

The Idaho Supreme Court elaborated on the fourth factor in *Eastern Idaho*

*Agricultural Credit Association v. Neibaur*, 987 P.2d 314, 320 (Idaho 1999),

stating:

> [F]or purposes of issue preclusion (as distinguished from merger and
> bar), 'final judgment' includes any prior adjudication of an issue in
> another action that is determined to be sufficiently firm to be accorded
> conclusive effect."). Under Comment g, entitled, "*Criteria for
> determining finality in the application of issue preclusion,*" the
> [Restatement (Second) of Judgments § 13 (1982)] reads:
>
> > [P]reclusion should be refused if the [prior] decision was
> > avowedly tentative. On the other hand, that the parties
> > were fully heard, that the court supported its decision
> > with a reasoned opinion, that the decision was subject to
> > appeal or was in fact reviewed on appeal, are factors
> > supporting the conclusion that the decision is final for
> > the purpose of preclusion.

*Neibaur*, 987 P.2d at 320 (third and fourth alterations in original).

In this instance, the State Court's decision was sufficiently final.  A

determination to allow an amendment to include punitive damages is reviewable

on appeal.  *See, e.g., Myers v. Workmen's Auto Ins. Co.*, 95 P.3d 977, 983 (Idaho

2004).  The State Court was not "avowedly tentative" when it ruled Plaintiffs were

allowed to amend their complaint to include punitive damages.  As the Court

concludes that the State Court's determination was sufficiently final to qualify for

MEMORANDUM OF DECISION - 45

issue preclusion, Plaintiffs have satisfied the threshold procedural requirement necessary to pursue punitive damages.

### 2.    Right to recover punitive damages

Idaho Code § 6-6014(1) states "In any action seeking recovery of punitive damages, the claimant must prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted."  Idaho law establishes that punitive damages are allowed in contract actions, however, they are generally disfavored and "should be awarded in only the most unusual and compelling circumstances."  *Seininger Law Office, P.A. v. N. Pac. Ins. Co.*, 178 P.3d 606, 614 (Idaho 2008).

To receive punitive damages, a plaintiff must establish both a bad act and a bad state of mind.  *Myers*, 95 P.3d at 985.  To justify punitive damages, a defendant must have: (1) "acted in a manner that was an extreme deviation from reasonable standards of conduct, . . . with an understanding of or disregard for its likely consequences," and (2) acted with "an extremely harmful state of mind, whether that be termed malice, oppression, fraud or gross negligence; malice, oppression, wantonness; or simply deliberate or willful."  *Seininger Law Office*, 178 P.3d at 615 (quoting *Myers*, 95 P.3d at 984) (internal quotation marks omitted).

Punitive damages have been permitted in actions for breach of a covenant not to compete.  *See, e.g., Davis v. Gage*, 682 P.2d 1282 (Idaho 1984); *but see*

MEMORANDUM OF DECISION - 46

*Gen. Auto Parts*, 979 P.2d at 1210–12 (upholding trial court's decision not to instruct the jury on punitive damages in a breach of covenant case).  In *Davis*, the defendants sold a restaurant to the plaintiffs, and a fifteen year covenant not to compete was included in the contract.  The Idaho Supreme Court noted that the trial court could consider acts and statements by the defendants outside the breach of the covenant in determining whether punitive damages were appropriate.  Those actions included bringing meritless actions to foreclose, misappropriating property that had been sold with the restaurant, and disconnecting the restaurant's drainfield.  Ultimately, the *Davis* court upheld the award of punitive damages, writing:

> The district court stated that it could 'imagine no clearer case of a violation of the intent expressed by the noncompetition clause in the original agreement.' Nor can we.  The covenant not to compete was clear and unambiguous.  The [defendants'] conduct was, according to the district court, 'willful, wanton, malicious and the proper subject of punitive damages.'

*Id.* at 1286.

Like *Davis*, this case involves a clear violation of the intent expressed by the Covenant.  In many ways, Bailey's breach was even more severe than in *Davis*.  Bailey, an attorney, knowingly negotiated the Covenant without the intention to abide by it.  And Bailey repeatedly violated the Covenant with numerous EAM clients over a span of time—with some conduct occurring after the State Court Case commenced, after the State Court determined he breached the

MEMORANDUM OF DECISION - 47

Covenant, and even after this bankruptcy commenced.  And like in *Davis*, Bailey's

breach was accompanied by circumstances that established his "willful, wanton,

malicious" behavior.  *See id.* (quoted above), and the discussion of § 523(a)(6),

*supra*.

The Court concludes Bailey's egregious conduct established the requisite

bad act and bad state of mind necessary to support an award of punitive damages

under Idaho law.

### 3.    Amount of punitive damages

Punitive damages are awarded "to serve the public policies of punishing a

defendant for outrageous conduct and of deterring future like conduct."  Idaho

Code § 6-1601(9); *see Schaefer v. Ready*, 3 P.3d 56, 60 (Idaho Ct. App. 2000)

(emphasizing that punishment of outrageous conduct, not just deterrence, is a

proper goal of punitive damages).

Idaho case law establishes that the amount of punitive damages is largely

within the trial court's discretion.  *Davis*, 682 P.2d at 1287 (citing *Cheney v. Palos

Verdes Inv. Corp*, 665 P.2d 661 (Idaho 1983).  Under Idaho Code § 6-1604(3), a

judgment for punitive damages may not exceed the greater of $250,000 or three

times the award of compensatory damages.  While "no strict mathematical ratio is

to be applied," *Boise Dodge, Inc. v. Clark*, 453 P.2d 551, 557 (Idaho 1969),

generally single-digit ratios are much more likely to meet constitutional due

process requirements, *Hall v. Farmers Alliance Mut. Ins. Co.*, 179 P.3d 276, 285

MEMORANDUM OF DECISION - 48

(Idaho 2008) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)).

Here, Bailey's intentional defrauding of Plaintiffs and interference with their prospective economic advantage warrants punishment. Bailey deliberately agreed to the Covenant, which he had no intention of abiding by, in order to induce Burks into entering the Stock Purchase Agreement. And he repeatedly violated the Covenant by introducing EAM clients to Aaron Seehawer and Van Carlson over a period of months. Additionally, punitive damages would deter Bailey or others who might engage in similar conduct.

Thus the Court, in its discretion, determines it is appropriate to award punitive damages of $135,217.65, an amount equal to the total compensatory damages awarded in this case under § 523(a)(2)(A) and § 523(a)(6).

### D.    Costs and attorneys' fees in the adversary proceeding

Plaintiffs' also request their attorneys' fees and costs in the instant action. That issue will be addressed by further submissions of the parties.

## CONCLUSION

Plaintiffs prevailed on both the § 523(a)(2)(A) claim and the § 523(a)(6) claim. Plaintiffs are entitled to a nondischargeable judgment of $100,280.00 for the § 523(a)(2)(A) violation and $34,937.65 for the § 523(a)(6) violations, for total compensatory damages of $135,217.65. Plaintiffs are also entitled to a nondischargeable judgment of $135,217.65 in punitive damages.

MEMORANDUM OF DECISION - 49

DATED:  August 23, 2013



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 50